MARK K. SCHONFELD
REGIONAL DIRECTOR

# 08 CV 03484

Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-0077 (Gizzi)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
APR 10 2008
U.S.D.C. S.D. N.Y.
CASHIERS

```
------------------------------------------------------------x
                                                            :
SECURITIES AND EXCHANGE COMMISSION,                         :
                                                            :
                        Plaintiff,                          :
                                                            :
            - against -                                     :
                                                            :
HEADSTART ADVISERS LIMITED and                              :
NAJY N. NASSER,                                             :          COMPLAINT
                                                            :
                        Defendants,                         :
                                                            :
            - and -                                         :
                                                            :
HEADSTART FUND LTD.,                                        :
                                                            :
                        Relief Defendant.                   :
                                                            :
------------------------------------------------------------x
```

The plaintiff Securities and Exchange Commission ("Commission") alleges the following

against defendants Headstart Advisers Limited ("HAL") and Najy N. Nasser ("Nasser" or,

together with HAL, the "Defendants") and relief defendant Headstart Fund Ltd. ("Headstart

Fund" or "Relief Defendant") (HAL, Nasser, and Headstart Fund are sometimes referred to

collectively as "Headstart"):

## SUMMARY

1.      The Commission brings this enforcement action against United Kingdom-based hedge fund adviser HAL and its "Chief Investment Adviser," Nasser. HAL and Nasser orchestrated a scheme to defraud mutual funds in the United States ("U.S. mutual funds") and their shareholders through late trading and deceptive market timing.

2.      From approximately September 1998 through September 2003, HAL actively traded U.S. mutual funds through Headstart Fund's accounts at numerous broker-dealers in the United States ("U.S. broker-dealers").

3.      HAL routinely engaged in late trading of U.S. mutual funds through Headstart Fund's accounts at two U.S. broker-dealers. HAL placed orders on behalf of its client, the Headstart Fund, to buy, redeem, or exchange mutual fund shares after the 4:00 p.m. Eastern Time ("ET") market close while still receiving the current day's mutual fund price, or net asset value ("NAV"). This illegal practice enabled Headstart Fund to profit – at the expense of other shareholders in the U.S. mutual funds – from market events that occurred after 4:00 p.m. ET, but that were not reflected in the price that Headstart Fund paid for the mutual fund shares.

4.      HAL also used deceptive techniques to market time U.S. mutual funds. Some U.S. mutual fund companies, for example, prohibited market timing and monitored trades above a certain dollar threshold. HAL therefore opened numerous accounts on behalf of the Headstart Fund at various U.S. broker-dealers, and split Headstart Fund trades among multiple accounts to keep the size of the trades below the threshold and conceal the extent of Headstart Fund's trading from U.S. mutual fund companies.

5.      HAL also used multiple accounts so that when a U.S. mutual fund company detected Headstart Fund's market timing trading and informed the U.S. broker-dealer through

whom the trades had been placed to stop, HAL would simply transfer funds to a new brokerage account of which the U.S. mutual fund company was not yet aware, and then resume market timing within the same U.S. mutual fund company.

6.     Nasser provided instructions to, or otherwise communicated with, registered representatives ("RRs") at U.S. broker-dealers in order to direct Headstart Fund's late trading and deceptive market timing of U.S. mutual funds.

7.     HAL, Nasser, and Headstart Fund benefited from this late trading and deceptive market timing at the expense of other shareholders in the U.S. mutual funds. Headstart Fund earned illicit profits of approximately $198 million from its late trading and deceptive market timing of U.S. mutual funds. HAL and Nasser obtained ill-gotten gains from the late trading and deceptive market timing scheme through, among other things, their receipt of performance and management fees for managing the Headstart Fund.

## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

8.     HAL and Nasser, directly or indirectly, singly or in concert, engaged in transactions, acts, practices, or courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder. In the alternative, HAL and Nasser engaged in acts, practices, or courses of business that aided and abetted violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange

Act, 15 U.S.C. § 78u(d)(1). The Commission seeks a permanent injunction to restrain and enjoin

HAL and Nasser from engaging in the transactions, acts, practices, and courses of business

alleged herein. The Commission seeks a judgment ordering HAL, Nasser, and the Headstart

Fund to disgorge their ill-gotten gains and to pay prejudgment interest thereon. The Commission

also seeks the imposition of civil money penalties against HAL and Nasser pursuant to Section

20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15

U.S.C. § 78u(d)(3). Finally, the Commission seeks all other just and appropriate relief.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a)

of the Securities Act, 15 U.S.C. §§ 77t(d) and 77v(a), and Sections 21(e) and 27 of the Exchange

Act, 15 U.S.C. §§ 78u(e) and 78aa.

11.     Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15

U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Certain of the

transactions, acts, practices, and courses of business alleged herein occurred within the Southern

District of New York. For instance, HAL and Nasser opened accounts for Headstart Fund at

U.S. broker-dealers located in New York, New York. Nasser also visited the offices of U.S.

broker-dealers located in New York, New York in furtherance of Headstart Fund's illegal trading

of U.S. mutual funds.

12.     HAL and Nasser, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, the means or instruments of transportation or

communication in interstate commerce, and/or the mails, in connection with the transactions,

acts, practices, and courses of business alleged herein.

4

## DEFENDANTS

13.     **HAL** is an investment adviser based in London, England.  During the relevant period, HAL served as the investment adviser to Headstart Fund.  HAL was formerly known as Folkes Asset Management Limited.

14.     **Nasser**, age 39, is a resident of the Principality of Monaco.  Nasser joined HAL in 1997 and has served as HAL's Chief Investment Adviser.  Nasser is currently HAL's sole director.  Nasser is a graduate of the London School of Economics with a master's degree in accounting and finance.

## RELIEF DEFENDANT

15.     **Headstart Fund** was incorporated in the Bahamas in December 2001 as an open-ended company with limited liability.  The Headstart Fund consists of multiple share classes characterized by varying investment strategies with each share class functioning as a separate pool.  At its height during the relevant period, the Headstart Fund had assets under management of at least $500 million (including leverage).

## FACTS

### Background - Late Trading and Market Timing

16.     The price of a U.S. mutual fund's shares is based on the value of the securities (and other assets) held by the mutual fund, and each fund is required by the Commission's regulations to calculate the value of the fund's holdings, or NAV, each trading day.  Generally, the U.S. mutual fund companies in which the Headstart Fund traded calculated the prices of their shares as of the close of the major United States securities exchanges and markets, normally 4:00 p.m. ET.

5

17.    Rule 22c-1(a), 17 C.F.R. § 270.22c-1, adopted pursuant to Section 22(c) of the Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. § 88a-22(c), requires registered investment companies issuing redeemable securities, principal underwriters and dealers, and any person designated in the fund's prospectus as authorized to consummate transactions in securities issued by the fund to sell and redeem fund shares at a price based on the current NAV next computed after receipt of an order to buy or redeem. U.S. mutual fund companies generally determine the daily price of mutual fund shares as of 4:00 p.m. ET. U.S. mutual fund companies' prospectuses generally state that orders received before 4:00 p.m. ET are executed at the price determined as of 4:00 p.m. ET that day, and that orders received after 4:00 p.m. ET are executed at the price determined as of 4:00 p.m. ET the next trading day.

18.    "Late trading" refers to the practice of placing orders to buy, redeem, or exchange mutual fund shares after the time as of which U.S. mutual fund companies calculate their NAV (usually as of the close of trading at 4:00 p.m. ET), but receiving the price based on the NAV already determined as of 4:00 p.m. ET. Late trading violates Rule 22c-1(a) under the Investment Company Act, enabling the trader to profit from market events that occur after 4:00 p.m. ET and are not reflected in that day's price. In particular, the late trader obtains an advantage – at the expense of the other shareholders of the U.S. mutual fund – when he learns of market moving information and is able to trade mutual fund shares at prices set *before* the market moving information was released. Late trading harms innocent shareholders in mutual funds by diluting the value of their shares.

19.    "Market timing" includes: (i) frequent buying and selling of shares of the same mutual fund or (ii) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing can harm other mutual fund shareholders because it can

6

dilute the value of their shares. Market timing, while not illegal per se, can also disrupt the management of the mutual fund's investment portfolio and cause the targeted mutual fund to incur considerable extra costs associated with excessive trading and, as a result, cause damage to other shareholders in the funds. Market timing is illegal, for example, if deception is used to induce a mutual fund to accept trades that it otherwise would not accept under its own market timing policies.

## Headstart Begins Trading U.S. Mutual Funds

20.     HAL established relationships with a number of U.S. broker-dealers beginning in 1998. In establishing relationships with U.S. broker-dealers, HAL employees were instructed to identify firms through which HAL could trade U.S. mutual funds that held international securities.

21.     For example, a HAL document entitled "Calling Broker Procedures" instructed HAL personnel to explain that Headstart Fund "is a very active short-term trader of mutual funds." Further, HAL personnel were instructed that "[i]t is not necessary at this point to mention that the hedge fund is a market timer, this can wait for future conversations when you are more comfortable." Finally, the document instructed HAL personnel that "[f]or the purposes of this call we are only looking for International capacity, steer clear of all domestic or at least make a note of the offer."

22.     Once HAL personnel established contact with a potentially interested U.S. broker-dealer, Nasser, or a trader at HAL, would confer with the broker-dealer about fees and other details of the potential relationship.

23.     HAL opened brokerage accounts at a number of U.S. broker-dealers, including:

(a)     "Broker-Dealer PRU," a broker-dealer registered with the Commission with an office in Boston, Massachusetts;

(b)     "Broker-Dealer KS," a broker-dealer registered with the Commission with an office in Boca Raton, Florida;

(c)     "Broker-Dealer CONC," a broker-dealer registered with the Commission with an office in Laurence Harbor, New Jersey;

(d)     "Broker-Dealer JBO," a broker-dealer registered with the Commission with an office in Beverly Hills, California;

(e)     "Broker-Dealer TW&Co.," a broker-dealer registered with the Commission with an office in New York, New York;

(f)     "Broker-Dealer AGE," a broker-dealer registered with the Commission with an office in Boston, Massachusetts;

(g)     "Broker-Dealer CIBC," a broker-dealer registered with the Commission with an office in New York, New York;

(h)     "Broker-Dealer PW," a broker-dealer registered with the Commission with an office in New York, New York;

(h)     "Broker-Dealer LB," a broker-dealer registered with the Commission with offices in London, England and New York, New York;

(i)     "Broker-Dealer SkyC," a broker-dealer registered with the Commission with an office in New York, New York; and

(j)     "Broker-Dealer SSB," a broker-dealer registered with the Commission with an office in New York, New York.

**Headstart Defrauded U.S. Mutual Fund Companies By Engaging in Late Trading**

24.    After HAL began trading U.S. mutual funds, Nasser understood that HAL had to submit U.S. mutual fund trades by 4:00 p.m. ET for Headstart Fund to receive that day's NAV.

25.    For example, on April 2, 2002, a former RR ("RR A") at Broker-Dealer PW sent Nasser an email with a link to an April 30, 2001 letter from the staff of the Commission's Division of Investment Management to the Investment Company Institute concerning fair value pricing of mutual funds. RR A indicated that the webpage related to fair value pricing and had significant references to "the international mutual fund timing trade."

26.    In the April 30, 2001 letter, the staff of the Division of Investment Management pointed out that Rule 22c-1(b) under Section 22(c) of the Investment Company Act requires U.S. mutual funds to calculate their NAVs at least once daily at a set time or times. The letter indicated that Rule 22c-1(a) requires funds to execute orders to buy or sell their shares at the NAV next computed after receipt of the order. The letter noted that most U.S. mutual funds calculate their NAVs at or near the close of the U.S. securities markets, which the letter indicated was 4:00 p.m. ET.

*Headstart Engaged in Late Trading Through Broker-Dealer KS*

27.    HAL and Nasser opened accounts on behalf of Headstart Fund through Broker-Dealer KS in February 2000.

28.    At the start of the relationship, Nasser negotiated and signed, on behalf of HAL, an "Agreement for Professional Services" with Broker-Dealer KS dated as of February 9, 2000.

29.    The February 9, 2000 agreement contained the following provisions:

2.1    Obligations. Understandings and Representations of Client.

A.    To enable the proper and timely execution of all orders received from the Client [HAL], the Client shall provide the following information to

9

[Broker-Dealer KS] in the manner specified:

> 1.    A preliminary daily trade blotter specifying contemplated [non-discretionary transactions ("Transactions")] to be executed by [Broker-Dealer KS] for Client for that day. The daily trade blotter, which shall be provided by facsimile transmission or e-mail, shall be received no later than 2:30 p.m. Eastern Standard Time (EST) at the offices of [Broker-Dealer KS] and shall identify the name and dollar or share amount of each fund which it is contemplated may be bought, sold or exchanged.

> 2.    Final instructions for trades to be executed for Client shall be provided telephonically or by e-mail and shall be received **no later than 4:30 p.m.** EST at the offices of [Broker-Dealer KS]. It is expressly understood that [Broker-Dealer KS] may, in its sole discretion, attempt, but shall not be obligated, to execute Transactions with respect to any instructions received after 4:30 p.m. EST.

(Emphasis added.)

30.    After the agreement was in place, Headstart Fund began to late trade U.S. mutual funds through Broker-Dealer KS.

31.    Typically, HAL submitted preliminary trades for Headstart Fund's accounts before 4:00 p.m. ET. HAL personnel, including Nasser, then called with the day's final trading instructions after 4:00 p.m. ET.

32.    HAL personnel frequently waited to call Broker-Dealer KS with the day's final trading instructions until after companies had made earnings announcements following the market close at 4:00 p.m. ET.

33.    On occasion, HAL even canceled Headstart Fund trades the following morning.

34.    Despite providing final trading instructions after 4:00 p.m. ET, Headstart Fund received that day's NAV for the U.S. mutual fund trades.

35.    Further, Nasser and other HAL personnel who called after 4:00 p.m. ET were fully aware that Headstart Fund would receive that day's NAV for the trades.

*Headstart Made Other Late Trading Arrangements*

36.    HAL also made arrangements for late trading at other broker-dealers.

37.    For instance, HAL personnel inquired whether they could late trade through Broker-Dealer CONC.

38.    An RR informed HAL that it could late trade through Broker-Dealer CONC.

39.    Thereafter, HAL personnel attempted to cancel previously placed trades after 4:00 p.m. ET because of aftermarket news.

40.    Specifically, on July 15, 2003, the market was down for the day. As a result, prior to 4:00 p.m. ET, HAL personnel instructed Broker-Dealer CONC to sell Headstart Fund's equity mutual fund positions. After the market close, Intel issued a positive earnings report. HAL personnel then called Broker-Dealer CONC with instructions to cancel HAL's previous instructions to sell Headstart Fund's equity mutual fund positions.

41.    Broker-Dealer CONC RRs then attempted to cancel the trades, but found out the next day that they were unsuccessful.

42.    On July 16, 2003, a RR at Broker-Dealer CONC sent an email to HAL memorializing these events:

> I just wanted to let you know that last night we had a problem with our trades. We originally got out of all of our positions at 4:00 pm est. However, since Intel reported good earnings, we were asked to cancel the trades. As far as we knew, the trades were cancelled, but we just found out that most of them were not cancelled (so we are in cash).

43.    Headstart also entered into a late trading agreement with Broker-Dealer JBO.

**Headstart Defrauded U.S. Mutual Funds by Engaging in Deceptive Market Timing**

44.     HAL and Nasser knew that many U.S. mutual funds disliked and prohibited market timing, and that U.S. mutual funds blocked market timing trades because, among other reasons, the trading activity harmed the mutual funds' performance.

45.     RRs at U.S. broker-dealers routinely informed Nasser and other HAL employees when U.S. mutual funds blocked Headstart Fund trades.

46.     HAL and Nasser therefore understood that they needed to hide Headstart Fund's market timing trading from U.S. mutual funds.

47.     U.S. mutual funds often tracked market timing by tax identification number, customer account number, RR number, the code for a particular branch office of a broker-dealer, and/or by broker-dealer.

48.     HAL and Nasser accordingly employed a number of deceptive tactics, including utilizing multiple accounts, multiple RR numbers, and trading through multiple broker-dealers, to help conceal Headstart Fund's identity and thereby trick the U.S. mutual funds into accepting Headstart Fund's trades.

*Headstart Used Multiple Account Names*

49.     HAL caused trading subsidiaries to be incorporated on behalf of the Headstart Fund that used names that bore no apparent connection to Headstart and then opened accounts at U.S. broker-dealers as part of the effort to evade mutual funds' efforts to block Headstart Fund's market timing.

50.     A HAL document, entitled "Setting Up New Trading Subsidiaries / Entities Procedures," contained instructions for HAL employees to follow in naming new accounts or

trading subsidiaries, including the following: "Shakespeare, TV shows or comics are an untapped pool of names, the Classics have been done to death."

51.    As part of this strategy, HAL opened accounts on behalf of Headstart Fund at U.S. broker-dealers through deceptively named trading subsidiaries, including the following:

- Calisto Enterprises Ltd.,

- Fernhill Investment Ltd.,

- Voldermort Ltd.,

- Wadson Family Ltd.,

- Marks Securities LLC, and

- Spencer Securities LLC.

52.    Further, Nasser suggested using the designation "401" as part of the trading subsidiary names so that the U.S. mutual funds would think that the Headstart Fund accounts were associated with 401(k) plans entitled to make unlimited trades in the fund companies' mutual funds.

53.    As part of this strategy, HAL opened accounts on behalf of Headstart Fund at U.S. broker-dealers in the following names, among others:

- Circe 401 Ltd.,

- Helios 401 Ltd.,

- Prometheus 401 Ltd.,

- Oriens 401 Ltd.,

- Oberon 401 Limited, and

- Windsor 401 Limited.

54.     HAL opened more than 500 brokerage accounts on behalf of Headstart Fund with at least ten U.S. broker-dealers for the purpose of market timing U.S. mutual funds.  For instance, HAL opened approximately 112 accounts at Broker-Dealer CIBC, approximately 78 accounts at Broker-Dealer KS, approximately 64 accounts at Broker-Dealer PRU, and approximately 48 accounts at Broker-Dealer JBO.

*Headstart Used Multiple Accounts to Stay "Under the Radar"*

55.     Headstart Fund used multiple brokerage accounts to remain "under the radar" of U.S. mutual funds.

56.     HAL and Nasser broke up Headstart Fund's trades into dollar amounts that HAL believed were under a dollar threshold that the mutual fund companies used to monitor market timing trades, in order to avoid being detected as a market timer.

57.     For example, HAL instructed Broker-Dealer KS to break up the size of Headstart Fund's trades.  On April 2, 2001, a HAL employee sent an email to a RR at Broker-Dealer KS, containing the following instruction to keep the size of trades in a U.S. mutual fund  ("Mutual Fund Company A") under $250,000 to stay under the radar: "[Mutual Fund Company A] - $250,000 – if we do a steady trickle maybe they will not notice us."

58.     Similarly, on March 1, 2001, a HAL employee sent an email to another RR at Broker-Dealer KS with "some suggestions for" an additional $10 million of Headstart Fund assets that were to be traded through accounts at a particular clearing broker.  The HAL employee listed, among other funds, a series of Mutual Fund Company A mutual funds for a $2 million investment, and noted that the suggestions were "dependent on how many accounts we can have with [the clearing broker], as [trades in Mutual Fund Company A have] to stay at a level of around $200,000 to $250,000 per account."

59.    Headstart Fund's subsequent trading in Mutual Fund Company A reflects HAL

and Nasser's efforts to avoid detection by splitting up trades. For example, on May 1, 2001,

Headstart made the following exchanges in Mutual Fund Company A mutual funds:

- $204,693 from a Mutual Fund Company A money market fund to a
  Mutual Fund Company A equity fund in account no. 103-01923; and

- $208,252 from a Mutual Fund Company A money market fund to the
  same Mutual Fund Company A equity fund in account no. 103-01603.

60.    Nasser also inquired how quickly Broker-Dealer KS could open additional new

accounts in order to reduce the likelihood that U.S. mutual funds would recognize Headstart

Fund's trading and then restrict its accounts.

### *Headstart Used Multiple Accounts to Continue Trading Following Kickouts*

61.    HAL and Nasser also used new or different accounts to continue trading within

U.S. mutual funds that had blocked Headstart Fund's trading.

62.    As discussed above, U.S. mutual funds regularly informed Headstart Fund's U.S.

broker-dealers that they had identified the Headstart Fund's trades as market timing and either

blocked the trades or froze the accounts.

63.    The U.S. broker-dealers, in turn, promptly conveyed the information to Nasser or

others at HAL.

64.    For instance, a RR at Broker-Dealer PRU received numerous kickout notices from

U.S. mutual funds concerning the Headstart Fund's trading. The RR either forwarded the

kickout notices to HAL by facsimile or email, or advised HAL of the kickout notice orally by

telephone.

65.    Additionally, almost immediately after HAL began trading through Broker-Dealer

LB, U.S. mutual funds began to reject Headstart Fund's trades. Among other things, U.S. mutual

funds threatened to terminate Broker-Dealer LB's dealer agreements. (Dealer agreements permit a broker-dealer to serve as a dealer and sell shares of the mutual fund companies' mutual funds.)

66.     In response, HAL and Nasser suggested ways through which Broker-Dealer LB could avoid losing its dealer agreements. For instance, in an August 23, 2002 email, a HAL employee wrote the following to Broker-Dealer LB personnel:

> I have spoken to Najy [Nasser] about your concerns and we fully understand and appreciate them, as this is an area that is obviously new to you and [Broker-Dealer LB], whereas we have been trading this system for the last 4 years and have watched this business develop during both the good and bad times. While we understand that these letters that you receive from the mutual funds threatening your dealer agreements are a concern to you, from our experience as long as we immediately cease trading these funds[,] the broker will not lose their dealer agreement. Usually we return to these funds after a certain period of time and successfully trade the funds for a while longer. However, in this case because we want to develop and maintain this relationship with you[,] we are prepared to steer clear of these funds until you feel comfortable about trading them again.

67.     Broker-Dealer LB agreed with this proposal, and allowed the Headstart Fund to resume trading with the caveat that Headstart Fund not trade in U.S. mutual funds that had rejected its trades due to market timing.

68.     In spite of this restriction, Headstart Fund continued trading in U.S. mutual funds that had previously sent kickout notices, ultimately leading Broker-Dealer LB to freeze Headstart Fund's accounts.

69.     As an additional example, on January 11, 2001, a U.S. mutual fund company ("Mutual Fund Company B") blocked two Headstart Fund accounts traded via Broker-Dealer KS for market timing. Broker-Dealer KS confirmed the block in a January 17, 2001 e-mail to HAL. Nonetheless, Headstart Fund continued market timing Mutual Fund Company B mutual funds through different accounts at Broker-Dealer KS.

70.     On January 23, 2001, Mutual Fund Company B again rejected two Headstart Fund trades. Still, Headstart Fund persisted and continued to market time Mutual Fund Company B mutual funds.

71.     In total, Headstart Fund made more than 140 additional purchases and exchanges in Mutual Fund Company B mutual funds through Broker-Dealer KS after January 17, 2001.

*Headstart Exploited Its Relationships with Multiple U.S. Broker-Dealers and Their Clearing Brokers to Engage in Deceptive Market Timing*

72.     HAL and Nasser understood that U.S. mutual fund companies at times identified market timing accounts through the broker-dealers and their clearing firms that were executing the trades.

73.     Accordingly, after a U.S. mutual fund blocked Headstart Fund accounts at a particular U.S. broker-dealer, HAL and Nasser would then continue to direct Headstart Fund trading in the same U.S. mutual fund through accounts at different brokers, or through brokerage accounts that cleared through different clearing firms.

74.     For example, as discussed above, Mutual Fund Company B blocked market timing accounts at Broker-Dealer KS on January 11, 2001 and this information was conveyed to HAL by January 17, 2001. At HAL's direction, the Headstart Fund then utilized accounts at other broker-dealers to continue timing Mutual Fund Company B mutual funds after January 17, 2001. For example, Headstart Fund made more than 275 purchases and exchanges of Mutual Fund Company B mutual funds through Broker-Dealer JBO, more than 20 purchases and exchanges through Broker-Dealer CONC, and more than 80 purchases and exchanges through Broker-Dealer PRU.

75.     Additionally, during the period from September 5, 2002 though December 19, 2002, a U.S. mutual fund ("Mutual Fund Company C") blocked thirteen Headstart Fund accounts

at Broker-Dealer PRU.  Nonetheless, Headstart Fund continued to time Mutual Fund Company C mutual funds through accounts at Broker-Dealer CONC, Broker-Dealer KS, and Broker-Dealer JBO.

76.    HAL and Nasser also utilized Broker-Dealer KS's relationships with multiple clearing brokers to enable the Headstart Fund to hide its market timing trading from U.S. mutual funds.

77.    After U.S. mutual funds identified Headstart Fund's accounts at Broker-Dealer KS as market timing accounts, HAL requested that Broker-Dealer KS clear Headstart Fund's trades through other clearing firms.

78.    For example, on February 27, 2001, a U.S. mutual fund company ("Mutual Fund Company D") placed a stop transfer on two Headstart Fund accounts at Broker-Dealer KS.

79.    On March 1, 2001, an employee of Broker-Dealer KS's primary clearing firm sent an email to Broker-Dealer KS advising that "EFFECTIVE IMMEDIATELY [MUTUAL FUND COMPANY D] FAMILY OF FUNDS ARE CLOSED FOR MARKET TIMING."

80.    HAL then liquidated Headstart Fund's Mutual Fund Company D holdings in accounts at Broker-Dealer KS, but took steps to continue timing Mutual Fund Company D.

81.    In a September 13, 2001 email, a HAL employee instructed RRs at Broker-Dealer KS that "[a]fter recent kickouts and discussions with both [Nasser] and [another HAL employee], our aim is to provide leverage for [Headstart Fund] at the new clearing platforms."

82.    Headstart Fund then opened additional accounts through Broker-Dealer KS's other clearing brokers ("Clearing Broker A" and "Clearing Broker B").

83.    HAL and Nasser then continued to direct the Headstart Fund to market time the same U.S. mutual funds, including Mutual Fund Company D, through accounts cleared by Clearing Broker A and Clearing Broker B.

84.    For example, in early 2002, the Headstart Fund resumed trading Mutual Fund Company D through an account at Broker-Dealer KS that cleared through Clearing Broker A.

85.    Mutual Fund Company D then blocked the accounts that cleared through Clearing Broker A.  In an April 16, 2002 email, Broker-Dealer KS advised HAL that "we are no longer allowed to trade [Mutual Fund Company D] at [Clearing Broker A]."

86.    HAL then continued to trade Mutual Fund Company D mutual funds through Clearing Broker B accounts at Broker-Dealer KS.  Specifically, between May 17, 2002 and September 19, 2002, HAL placed 19 additional purchases and exchanges in Mutual Fund Company D mutual funds through Clearing Broker B accounts at Broker-Dealer KS.

*Headstart's U.S. Broker-Dealers Used Multiple RR Numbers*

87.    Because HAL and Nasser understood that some U.S. mutual fund companies tracked market timing accounts by the RR who was responsible for the customer account, HAL requested that RRs at U.S. broker-dealers use multiple RR numbers in connection with Headstart Fund's mutual fund trading to avoid being identified as a market timer.

88.    For example, in an April 2, 2001 email to an RR at Broker-Dealer KS, a HAL employee requested that the RR use different broker identification numbers to market time a U.S. mutual fund company's ("Mutual Fund Company E") mutual funds:

[Mutual Fund Company E] - $250,000 – before you say no, if you buy and sell with one rep number and exchange with another you can get away with timing it – tried and tested!!

89.     In addition, when an RR at Broker-Dealer PRU advised Nasser that he had added an RR to the group servicing HAL, Nasser indicated that other U.S. broker-dealers had been using multiple RR numbers in carrying out Headstart Fund's market timing activities.

90.     In total, Broker-Dealer KS entered trades for Headstart Fund using at least 35 different RR numbers.

91.     Similarly, Broker-Dealer PRU used at least 13 different RR numbers in timing mutual funds for Headstart Fund.

*Nasser Understood that Headstart Deceived U.S. Mutual Fund Companies*

92.     As described above, HAL and Nasser understood that U.S. mutual fund companies sought to curtail Headstart Fund's market timing and therefore HAL and Nasser used deceptive means to continue market timing.

93.     For example, at a 2001 meeting with personnel from a firm that provided financing to the Headstart Fund, Nasser and other HAL personnel explained that the majority of the Headstart Fund trades were done on an undisclosed basis in order to stay under the radar of the U.S. mutual funds, including utilizing multiple trading subsidiary names to limit the chance of detection.

94.     Additionally, in 2002, personnel from Broker-Dealer LB met with Nasser and others in London to discuss Headstart Fund's market timing business. When Broker-Dealer LB personnel raised questions about whether mutual funds would tolerate HAL's proposed trading strategy, Nasser offered assurances that HAL's trading would not generate substantial kickouts, and he described HAL as a "white hat" of the market timing business. In view of the high number of kickouts that HAL had received up to that point, Nasser, of course, knew that this statement was false.

*Headstart Profited from Illegal Late Trading and Deceptive*
*Market Timing While U.S. Mutual Funds Suffered Harm*

95.     During the period from approximately September 1998 through September 2003,

HAL, Nasser, and Headstart Fund earned ill-gotten gains through their fraudulent late trading

and market timing of U.S. mutual funds.

96.     In particular, the Headstart Fund earned approximately $198 million in profits

from its late trading and deceptive market timing of U.S. mutual funds.

97.     HAL profited through advisory fees, including fixed management fees and

incentive fees as the adviser to the Headstart Fund.

98.     Nasser profited through, among other things, his position as HAL's Chief

Investment Adviser.

99.     At the same time, U.S. mutual funds and their shareholders were harmed.  For

example, Headstart Fund's trading diluted the value of U.S. mutual funds it traded and increased

transaction costs associated with the mutual funds' management.

### FIRST CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act,**
**Section 10(b) of the Exchange Act, and Rule 10b-5**

100.    The Commission repeats and realleges paragraphs 1 through 99 above.

101.    HAL and Nasser, directly or indirectly, singly or in concert, by use of the means

or instrumentalities of interstate commerce, or of the mails, or of the facility of a national

securities exchange, in the offer and sale, and in connection with the purchase or sale, of

securities, knowingly or recklessly:  (a) employed devices, schemes and artifices to defraud; (b)

obtained money or property by means of, or otherwise made, untrue statements of material fact,

or omitted to state material facts necessary in order to make statements made, in light of the

circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

102.    As part of and in furtherance of the fraudulent scheme, HAL and Nasser engaged in late trading and deceptive market timing of U.S. mutual fund companies. HAL and Nasser regularly placed mutual fund trades on behalf of the Headstart Fund after 4:00 p.m. ET, and understood that those trades would improperly receive that day's NAV instead of the following day's NAV. Additionally, HAL and Nasser utilized multiple deceptive practices to conceal the Headstart Fund's identity and trading strategies from U.S. mutual fund companies, to enable the Headstart Fund to market time mutual funds that had previously prohibited the Headstart Fund from further trading.

103.    HAL and Nasser misrepresented, and failed to disclose, material information to U.S. mutual fund companies to induce them to accept Headstart Fund's trades.

104.    Nasser knowingly or recklessly engaged in the fraudulent conduct alleged above. Because Nasser was the Chief Investment Adviser and/or a director of HAL, Nasser's scienter is imputed to HAL.

105.    By reason of the foregoing, HAL and Nasser, directly or indirectly, violated, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### In the Alternative, HAL and Nasser Aided and Abetted Violations of Sections 10(b) Exchange Act and Rule 10b-5

106.    The Commission repeats and realleges paragraphs 1 through 99 above.

107.    HAL's U.S. broker-dealers and their respective RRs, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale, of securities, knowingly or recklessly:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

108.    Numerous broker-dealers, including Broker-Dealer KS and Broker-Dealer PRU, engaged in late trading and/or deceptive market timing of U.S. mutual funds and committed primary violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

109.    HAL and Nasser substantially assisted the primary violations described above. For example, HAL and Nasser directed the trading of Headstart Fund's accounts on a daily basis, and knew that Broker-Dealer KS was accepting the Headstart Fund's trades submitted after 4:00 p.m. ET, but executing the trades as though they had been received before 4:00 p.m. ET. Additionally, HAL and Nasser knew that various U.S. broker-dealers, including Broker-Dealer PRU, employed deceptive practices to conceal the Headstart Fund's identity and trading strategies from U.S. mutual fund companies, to enable Headstart Fund to market time mutual funds that had previously prohibited the Headstart Fund from further trading.

110.    HAL and Nasser knew that the U.S. broker-dealers engaged in the fraudulent conduct alleged above.

111.    Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and by reason of the foregoing, HAL and Nasser, singly or in concert, directly or indirectly, aided and abetted violations of, and unless enjoined will again aid and abet violations of, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

#### Relief Defendant Headstart Fund

112.    The Commission repeats and realleges paragraphs 1 through 111 above.

113.    The Headstart Fund obtained substantial illicit profits as a result of the fraudulent late trading and deceptive market timing of U.S. mutual fund companies.

114.    The Headstart Fund was the recipient of such ill gotten gains under circumstances in which it is not just, equitable or conscionable for it to retain the illegal proceeds. Consequently, the Headstart Fund has been named as a Relief Defendant for the amount of such proceeds by which it has been unjustly enriched as a result of the fraudulent scheme described in this Complaint.

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

#### I.

Permanently enjoining HAL and Nasser, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## II.

Ordering Nasser, HAL and the Headstart Fund to disgorge the ill-gotten gains received

from the violative conduct alleged in this Complaint, and to pay prejudgment interest thereon.

## III.

Ordering HAL and Nasser to pay civil money penalties pursuant to Section 20(d) of the

Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §

78u(d)(3).

## IV.

Granting such other and further relief as the Court may deem just and proper.


Dated: New York, New York
      April 10, 2008


                    Mark K. Schonfeld

                    Attorney for the Plaintiff
                    SECURITIES AND EXCHANGE COMMISSION
                    New York Regional Office
                    3 World Financial Center
                    New York, New York 10279
                    (212) 336-0077 (Gizzi)
                    Email: gizzip@sec.gov; salzbergm@sec.gov


Of Counsel:

Kay L. Lackey (not admitted in New York)
Paul G. Gizzi
Mark D. Salzberg